**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Darin Jones,                                    ) | No. CV 10-2769-PHX-RCB (SPL) |
|                       )| |
|              Plaintiff,             ) | **O R D E R** |
|                       )| |
|     vs.                              ) | |
|                       )| |
| Corrections Corporation of America,   ) | |
|                       )| |
|              Defendant.            ) | |
|                       )| |
| _____ ) | |

Before the Court is Defendant's Motion for Summary Judgment (Doc. 178) and Plaintiff's Motion for Leave to File Non-Electronic Document (Doc. 188).

The Court will grant Defendant's motion, deny Plaintiff's motion as moot, and dismiss the action with prejudice.

**I.    Background**

Plaintiff Darin Jones is an inmate in the custody of the Alaska Department of Corrections (ADC) (Doc. 179, Defs.' Statement of Facts (DSOF) ¶ 1).  In March 2010, he filed this civil rights action pursuant to 42 U.S.C. § 1983 in the United States District Court for the District of Alaska (Doc. 3).[1]  Plaintiff alleged various Eighth Amendment violations by Defendant Corrections Corporation of America (CCA) (Doc. 73-3; Doc. 96).   In December 2010, the case was transferred to the District of Arizona (Doc. 73).

---

[1]Plaintiff filed his action pro se but has since retained counsel (Doc. 148).

Plaintiff's claims arose during his confinement at the Red Rock Correctional Center (RRCC), a private facility in Eloy, Arizona, which is owned and operated by CCA and which, during the relevant time, housed Alaskan inmates pursuant to a contract with the ADC (Doc. 73-3; Doc. 179, DSOF ¶ 3).  In his Complaint, Plaintiff set forth three counts alleging failure to protect/threat to safety, three counts alleging deliberate indifference to serious medical needs, and one count alleging denial of adequate sanitation (Doc. 73-3; Doc. 96).

**II.    Facts**

Plaintiff's claims are based on an extensive factual scenario of events beginning in late 2008 and running through 2009 (Doc. 73-3 at 8-16, 18-19).  The following disputed and undisputed facts are derived from Plaintiff's Complaint (id.), the parties' separate Statements of Facts (Doc. 179, DSOF; Doc. 181, Attach., Pl.'s Statement of Facts (PSOF)), and Plaintiff's affidavit (Doc. 183, Attach. (Doc. 183-1)[2]).

In 2006, Plaintiff was transferred to the RRCC (DSOF ¶ 3; PSOF ¶ 3).  Plaintiff states that he was a member of a group that referred to itself as the Low Lifes, which was a group of like-minded prisoners of different races who grouped together due to prison gangs (PSOF ¶ 4).  Defendant states that Plaintiff was a verified member a security threat group called the Low Lifes, which it describes as a white supremacy prison gang (DSOF ¶ 4).

In November 2008, Plaintiff was assigned to Fox Unit, Echo Pod (DSOF ¶ 8; PSOF ¶ 8).  On November 28, 2008, a Low Life member and a rival gang member got into a fight (DSOF ¶ 9; PSOF ¶ 9).  Two days later, in retaliation for the November 28 fight, a rival gang member assaulted a different Low Life member (DSOF ¶ 10; PSOF ¶ 10).  On December 2, 2008, Plaintiff was placed in administrative segregation for possible involvement in the November 28 incident (DSOF ¶ 11; PSOF ¶ 11).  Plaintiff states that he was not involved in either of the two fights (PSOF ¶ 11).  But when he was questioned about the assaults, Plaintiff refused to say who was involved and that he could not tell on his friends or anyone else because he did not want to be considered a rat (DSOF ¶ 12; PSOF ¶ 12; Doc. 183, Pl.

---

[2]The Court includes both the standard citation and the citation to the document and page number in the Court's Case Management/Electronic Case Filing system.

Aff. ¶ 6 (Doc. 183-1 at 2)).

Plaintiff was released from administrative segregation on December 26, 2008, and placed in Fox Unit, Delta Pod (DSOF ¶ 13; PSOF ¶ 13). Defendant states that when Plaintiff learned of this housing assignment, he told Chief of Unit Management Gina Sween that he could not live there because he "would only get in trouble," but he would not provide any further details (DSOF ¶ 14). Plaintiff states that he was placed in a cell with an inmate named "Psycho," who Plaintiff states was an associate of a rival gang (PSOF ¶ 14). Upon Plaintiff entering the Pod, a rival gang member—Halton—asked Plaintiff to come to his cell (DSOF ¶ 15; PSOF ¶ 15). At that time, there were no issues between Plaintiff and Halton, so Plaintiff went voluntarily into the cell; however, upon entering the cell, Plaintiff was assaulted by Psycho and another rival gang member (DSOF ¶¶ 16-17; PSOF ¶¶ 16-17). After the assault, Halton told Plaintiff to leave and not come back or "he would be pretty much killed" (DSOF ¶ 19; PSOF ¶ 19). Plaintiff states that when he was beaten, there was no staff in the Pod (Doc. 183, Pl. Aff. ¶ 10).

Defendant states that Plaintiff did not report this assault to staff (DSOF ¶ 20). Plaintiff states that after the assault, he was covered in blood and immediately went to the gate, and as he passed through the gate, Lieutenant Franco and Correctional Officer (CO) Minor were coming in and questioned him for twenty minutes as to what happened, but Plaintiff refused to identify the assailant (PSOF ¶ 20), and he refused to tell officers what happened (DSOF ¶ 21; PSOF ¶ 21). Plaintiff was then placed back into administrative segregation (DSOF ¶ 22; PSOF ¶ 22).

Later on December 26, 2008, Plaintiff was examined by medical staff, and the parties set forth numerous factual assertions and disputes over whether Plaintiff showed signs of rib injury, whether he complained of rib pain, and whether facial injuries were obvious on his face from the assault (DSOF ¶¶ 23-25; PSOF ¶¶ 23-25).

On December 26, 2008, Plaintiff was found guilty of an infraction due to his unwillingness to remain in Fox Unit (PSOF ¶ 26). On December 30, 2008, he told staff member Anthony that he did not want to go back to Fox Unit because he was trying to stay

out of trouble and there would be trouble in Fox Unit (id.). While he was in segregation, Plaintiff met with Unit Manager Booker to discuss his cell assignment (DSOF ¶ 27 (in part); PSOF ¶ 27). Plaintiff told Booker that he did not want to go to Fox Unit and preferred to go to Hotel Unit, but Booker told him that Hotel Unit was locked down so he could not go there; Plaintiff said he could wait in segregation for another day (PSOF ¶ 28). Plaintiff states he requested to go any where but Fox Unit because there would be trouble in that unit (id. ¶ 29), but Plaintiff refused to elaborate on what he meant by "trouble" (DSOF ¶ 31). Defendant states that due to Plaintiff's security classification, housing instructions, and STG status, he could be assigned only to Fox Unit (DSOF ¶ 28). Defendant states that there was no indication that Plaintiff requested to be separated from any particular inmate in the Fox Unit (DSOF ¶ 29). Plaintiff states he believed Booker already knew the situation since they had investigated the assaults and separated the rival gang members, and Plaintiff did not want to be labeled an informant (PSOF ¶ 31). The parties dispute whether Plaintiff informed Booker that he had just been beaten up and had broken ribs, but they do not dispute that Plaintiff would not name any prisoners involved (DSOF ¶ 32; PSOF ¶ 32). Booker asked Plaintiff if he wanted to be placed in protective custody, but Plaintiff declined (DSOF ¶ 33; PSOF ¶ 33). Plaintiff states that given what happened in Fox Unit due to rival gang activity, Booker was required to involuntarily place Plaintiff in protective custody, but refused to do so (PSOF ¶ 33).

Defendant states that Booker offered to place Plaintiff in Fox Unit, Bravo Pod and that Plaintiff said he had no problem with that placement and even approved his cellmate (DSOF ¶¶ 34-35). Plaintiff, however, states that he did not want to go to Bravo Pod because there would be trouble since all the other Low Lifes had been moved out of Fox Unit, and he states he had no idea who his cell mate would be and did not approve any cell mate (PSOF ¶¶ 34-35).

Upon his release from administrative segregation on January 8, 2009, Plaintiff was assigned to Bravo Pod in Fox Unit (DSOF ¶¶ 26, 36; PSOF ¶¶ 26 (in part), 36). He states that when he arrived, there was no staff in the Unit (Doc. 183, Pl. Aff. ¶ 20). That same day,

Halton and another rival gang member, Mikell, walked into Bravo Pod (DSOF ¶ 37; PSOF ¶ 37).  Plaintiff states that neither of these two inmates were assigned to Bravo Pod (PSOF ¶ 37).  Plaintiff states that Halton had a weapon when he entered the Pod and Plaintiff believed that they entered the Pod to attack him (PSOF ¶ 38).  Defendant states that, without provocation, Plaintiff lunged at Mikell and stabbed him in the stomach, puncturing his colon (DSOF ¶ 38).  Defendant states that Halton then confronted Plaintiff, at which time another inmate struck Plaintiff in the back of the head with a "lock in a sock" (DSOF ¶¶ 39-40; PSOF ¶ 40).  Defendant states that Halton and Plaintiff then fought; Plaintiff states he was trying to defend himself (DSOF ¶ 41; PSOF ¶ 41).  Plaintiff states that he was hit in the head several times, knocked down, and taken into a cell (Doc. 183, Pl. Aff. ¶ 22).[3]

After the assault, both Plaintiff and Mikell were airlifted to the Maricopa Medical Center (DSOF ¶ 42; PSOF ¶ 42).  Plaintiff was treated for a skull fracture and an intracranial hemorrhage and he underwent surgery (DSOF ¶ 43; PSOF ¶ 43).[4]  Plaintiff was discharged from the hospital on January 20, 2009, and returned to medical segregation at RRCC for five days (DSOF ¶ 45 (in part); PSOF ¶ 45 (in part)).

Plaintiff states that after his return, he began to suffer panic attacks and post-traumatic stress disorder, and he was placed on medications that made his problems worse (Doc. 73-3 at 15).  Plaintiff states that due to his psychiatric condition, he was tearing out his toe nails to combat the pain in his head (Doc. 183, Pl. Aff. ¶ 32). He states that medical told him to stop the medication, and, when he did, he cut himself and received 32 stitches in his arm (Doc. 73-3 at 15).

---

[3]Plaintiff has submitted a video compact disc (CD) of this altercation, which is the subject of his Motion for Leave to File Non-Electronic Document (Doc. 188; see June 25, 2012 docket entry).  That motion is addressed in the summary-judgement analysis.

[4]The parties present disputed factual assertions regarding treatment Plaintiff received at the hospital, medication prescribed, and observations by medical staff (DSOF ¶ 44; PSOF ¶¶ 43-44).  Both parties rely on the affidavit of a physician who did not treat Plaintiff but reviewed the medical records (Doc. 179, Ex. 8, Keith Ivens Aff. ¶¶ 4-5).  As set forth in the summary-judgment analysis, this affidavit testimony is inadmissible.

1    Plaintiff states that he was then placed in a "rubber room," where he had only a hole

2    in the floor for a bathroom, no cleaning supplies, and no way to clean his arm (id. at 18).

3    Plaintiff states that he was kept in the rubber room for five days, that there was a grate over

4    the hole so there was no place to defecate without pushing the feces through the grate with

5    his fingers, and that his arm got infected and the stitches started coming out (id. at 13, 18;

6    PSOF ¶ 89).  Defendant states that this room is the RRCC's medical safe cell and that

7    Plaintiff was placed there on suicide precaution (DSOF ¶¶ 84-85).  Defendant states that the

8    safe cell is padded with no furniture or fixtures and has an area in the ground for use to go

9    to the restroom, and that toilet paper is provided at the inmate's request (id. ¶ 86).

10    On December 19, 2009, Plaintiff was moved out of RRCC, transferred back to Alaska,

11    and placed in a mental health unit (Doc. 179, , Ex. 1, Booker Aff. ¶ 5 & Ex. 4 (Doc. 179-1

12    at 3, 51); Doc. 73-3 at 19).

13    **III.    Specific Counts**

14    The Court has identified the following six counts against Defendant:

15    **Counts I, III, and V-**alleged deliberate indifference to a risk of harm by returning

16    Plaintiff to the unit where he and his friends had been attacked (Doc. 96).  Specifically, in

17    Count I, Plaintiff alleges that his placement back in Fox Unit on December 26, 2008, after

18    he warned officials that there would be trouble if he went back to that unit, amounted to

19    deliberate indifference to a substantial risk to his safety and caused him to suffer injuries

20    from an attack by other inmates (see Doc. 73-3 at 8-12).  He further alleges that his

21    placement back in Fox Unit on January 8, 2009—after he told them there would be problems

22    if he returned there and after the December 26, 2008 assault—constituted deliberate

23    indifference to a substantial risk of harm and caused him to suffer serious injury (id. at 10-

24    12).

25    In Count III, Plaintiff alleges that Defendant was deliberately indifferent to a

26    substantial risk of serious harm when it placed him back in Fox Unit on January 8, 2009, and

27    that as a result, he now suffered severe post-traumatic stress disorder, seizures, and anxiety

28    (see id. at 14).

And in Count V, Plaintiff refers to his December 26, 2008 and January 8, 2009 placements and alleges that "this situation goes above inmate actions" because Defendant was aware of the previous events and knew that Plaintiff would be in danger if housed in Fox Unit, yet it nonetheless placed him there not once but twice, and both placements resulted in injuries to Plaintiff (id. at 16).[5]

Count II–alleged deliberate indifference by failing to provide prescribed pain medication for Plaintiff's head injury that resulted from the January 8, 2009 altercation (id. at 13).

Count IV–alleged deliberate indifference by failing to treat Plaintiff's mental health issues (id. at 15).

Count VII–alleged failure to provide sanitation—namely, adequate restroom facilities and a means to clean his stitches—and alleged deliberate indifference by failing to treat his infected stitches (id. at 18-19; Doc. 96).

Defendant moves for summary judgment on all counts on the grounds that (1) Plaintiff failed to exhaust administrative remedies for all but one of his claims as required under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a); (2) Plaintiff cannot show that a CCA policy or custom caused a constitutional deprivation; and (3) Plaintiff cannot prove an underlying constitutional violation (Doc. 178).

**IV.    Exhaustion**

Defendant's first argument for summary judgment is that Plaintiff did not properly exhaust remedies for all Counts except Count IV (id. at 6-8). Exhaustion is a matter in abatement, which is properly raised in an unenumerated Rule 12(b) motion to dismiss rather than a motion for summary judgment. Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003). To the extent that Defendant argues nonexhaustion, the motion will be construed as

---

[5]Defendant notes that it is uncertain exactly what Plaintiff alleges in Count V and whether that Count remains in this lawsuit (Doc. 78 at 11 n. 8). The Court construes Count V as supporting his claims in Counts I and III and specifically asserting Defendant's liability for the alleged failure to protect.

1    an unenumerated Rule 12(b) motion to dismiss.

2        **A.    Legal Standard**

3        Under the PLRA, an inmate must exhaust available administrative remedies before

4    bringing a federal action. <u>See</u> 42 U.S.C. § 1997e(a); <u>Griffin v. Arpaio</u>, 557 F.3d 1117, 1119

5    (9th Cir. 2009). Exhaustion is required for all suits about prison or jail life, <u>Porter v. Nussle</u>,

6    534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative

7    process, <u>Booth v. Churner</u>, 532 U.S. 731, 741 (2001). An inmate must complete the

8    administrative review process in accordance with the applicable rules. <u>See</u> <u>Woodford v.</u>

9    <u>Ngo</u>, 548 U.S. 81, 92 (2006).

10        Exhaustion is an affirmative defense. <u>Jones v. Bock</u>, 549 U.S. 199, 212 (2007).

11    Therefore, the defendant bears the burden of raising and proving the absence of exhaustion.

12    <u>Wyatt</u>, 315 F.3d at 1119. Because exhaustion is a matter in abatement in an unenumerated

13    Rule 12(b) motion, a court may look beyond the pleadings to decide disputed issues of fact.

14    <u>Id.</u> at 1119-20. When doing so, a court has broad discretion as to the method to be used in

15    resolving the factual dispute. <u>Ritza v. Int'l Longshoremen's & Warehousemen's Union</u>, 837

16    F.2d 365, 369 (9th Cir. 1988) (quotation omitted).

17        **B.    Arguments**

18            **1. Defendant's Motion**[6]

19        Defendant submits the affidavit of Carl Richey, the RRCC Grievance Coordinator,

20    who describes the RRCC grievance procedure, which incorporates the requirements set forth

21    in ADC Policy 808.03—"Prisoner Rights" (Doc. 179, Ex. 11, Richey Aff. ¶¶ 2, 7-8, Ex. A).

22    First, inmates must try to resolve their issue informally by speaking with a staff member, and,

23    if that fails, they submit a Request for Interview Form (<u>id.</u> ¶ 15). If an issue remains

24    unresolved, an inmate must then file a Formal Grievance Form within 30 days of the incident

25    and attach copies of the informal staff response, if one was provided (<u>id.</u> ¶ 16). The Facility

26    _____

27        [6]Defendant initially argues that Plaintiff admitted that he failed to exhaust
28    administrative remedies; however, those admissions were withdrawn by the Court (Doc.
    178 at 6; Doc. 186).

Standards Officer (the Grievance Coordinator) logs the grievance and then screens it for any deficiencies, i.e., non-grievable issues, untimeliness, incompleteness, factually incredible, or devoid of merit  (id. ¶ 17).  If a Formal Grievance is screened out, the inmate can appeal by filling out a Request for Interview Form and indicating why the screening was incorrect; a copy of the Formal Grievance and the screening form must be attached (id. ¶ 18).  The Facility Standards Officer then records the appeal and forwards it to the Facility Manager, who issues a written decision that constitutes the final administrative action for screened grievances (id.).

If a Formal Grievance is not screened out, the complaint is investigated by an objective staff member; those findings are forwarded to the Facility Manager; and the Facility manager adopts or rejects the investigator's recommendations (id. ¶ 19).  Any health-care complaints are investigated and determined by the Institutional Health Care Officer (id.).

If the inmate is not satisfied with the Formal Grievance determination, he must file an appeal within 2 working days of receipt of the decision (id. ¶ 20).  To appeal, the inmate submits a Prisoner Grievance Appeal Statement, which must include all issues the inmates wants resolved (id.).  The Facility Standards Officer receives and records all appeals, then forwards them to the Director, who either affirms or reverses the Facility Manager's decision (id. ¶¶ 20-21).

If the inmate is not satisfied with the Director's decision, he may submit a letter to the Standards Administrator within 20 days of receipt of the decision (id. ¶ 21).  The Standards Administrator's decision serves as the final administrative action for non-screened-out grievances (id.).

If the Formal Grievance is a health-care complaint, the appeal is forwarded to the Medical Advisory Committee, which investigates the complaint and issues a decision (id. ¶ 22).  The Medical Advisory Committee's decision is the final administrative action for health care, non-screened-out grievances (id.).

Richey states that when inmates arrive at the RRCC facility, they are provided a copy of the Alaska Unit Prisoner Handbook, which contains a summary of the facility grievance

1   policies and procedures, and they are given a verbal explanation of the grievance procedures

2   during orientation (id.).

3        Richey avers that he reviewed the RRCC grievance log for the time relevant to

4   Plaintiff's claims and states that based on that log, Plaintiff did not exhaust remedies for his

5   failure-to-protect claims in Counts I, III, and V; for his medical claims that he was denied

6   adequate pain medication following the January 8, 2009 incident and that he was denied

7   medical treatment for injuries sustained to his arm in October 2009, as set forth in Counts II

8   and VII; or for any claim that he was denied adequate sanitation or access to a restroom as

9   alleged in Count VII (id. ¶¶ 26-27).

10       With respect to Counts I, III, and V, Richey states that Plaintiff filed a formal

11  Grievance on May 3, 2009; however, that Formal Grievance was screened out on May 6,

12  2009 because it was factually incredible or clearly devoid of merit (id. ¶ 28).  Richey states

13  that the grievance log reflects that Plaintiff thereafter did not timely file an appeal of this

14  determination (id.).  Richey explains that, instead, Plaintiff submitted a Request for Service

15  Form directly to the Warden on May 15, 2009, but did not attach a copy of the Formal

16  Grievance or the response thereto (id.).  According to Richey, this form did not constitute an

17  appeal because it was not filed within 2 days of receipt of the grievance determination; it was

18  not properly filed on a Request for Interview Form; it did not attach the required grievance

19  documents; it was not submitted to Richey; and it included a new issues about legal copies,

20  which is not permitted on appeals (id.).  For these reasons, Richey states that the Warden's

21  response—which stated that there is an investigation being handled by the Eloy police

22  department—does not constitute a response to an appeal.

23       Richey states that Plaintiff also filed a Formal Grievance regarding pain medication

24  for his head (Count II); however, when the grievance was denied and he appealed, Plaintiff

25  failed to include in his appeal the issue of pain medication for his head and instead raised

26  other issues pertaining to medication for anxiety (id. ¶ 29).  Richey explains that, as a result,

27  the appeal does not constitute exhaustion of the claim in Count II (id.).

28       In its motion, Defendant relies on Richey's affidavit to argue that Plaintiff failed to

properly exhaust administrative remedies for all claims except his mental-health claim in Count IV (id. 178 at 8).

### 2. Plaintiff's Response

In response, Plaintiff acknowledges that he received a Prisoner Handbook when he was transferred to RRCC (Doc. 181 at 9), but in his affidavit, he avers that he never received a verbal explanation of any grievance procedures from RRCC staff, nor was he ever given a Prisoner's Handbook after he returned to the facility from the hospital (Doc. 181, Ex. A, Pl. Aff. ¶ 27 (Doc. 181-3 at 8)).  Plaintiff states that when he returned from the hospital, he was not allowed any personal property in his cell, and he had difficulty speaking, reading, and writing for months after the trauma to his brain (id.).  He further states that he suffered panic attacks, could not think clearly, and was extremely paranoid and frightened (id.).

As to the grievance policy, Plaintiff asserts that the procedure provides that a prisoner may go to the next level but does *require* that he do so (Doc. 181 at 9).  Plaintiff argues that the grievance procedure is additionally flawed because it allows persons whose actions are being grieved to screen the grievance (id. at 8).  He points to his May 3, 2009 Prisoner Grievance form that grieved, among other things, the actions of Warden Clover (id.; Doc. 179, Ex. 11, Ex. B (Doc. 179-2 at 40)).  Plaintiff states that Clover signed the screening form and returned it as devoid of merit (Doc. 181 at 8; Doc. 179, Ex. 11, Ex. C (Doc. 179-2 at 46)).

Plaintiff also avers that shortly after submitting the May 3, 2009 Prisoner Grievance form, he was told by his jailers that the disciplinary board action against him must be completed before he could file a grievance (Doc. 181, Ex. A, Pl. Aff. ¶ 26 (Doc. 181-3 at 8)).  He states that Unit Manager Booker and Correctional Counsels Mohn and Anthony told him that the criminal investigation was ongoing and disciplinary board action was pending; therefore, he needed to wait until those actions were completed (id.).

Plaintiff contends that the special circumstances presented here—(1) his mental injuries and mental state following a skull fracture and traumatic brain injury and (2) the misleading statements made to him that he had to wait for completion of disciplinary action

1   and police investigation—justify any failure to complete administrative remedies (Doc. 181

2   at 14).[7]

### 3. Defendant's Reply

4   Defendant first argues that regardless of the permissive language in the grievance

5   policy, which states that an inmate "may" submit a grievance or appeal, the PLRA requires

6   inmates to exhaust all available administrative remedies; thus, Plaintiff was required to use

7   all steps in the grievance process (Doc. 184 at 2).

8   Defendant next argues that any claim that Plaintiff did not know how to follow the

9   grievance policy or was afraid to file grievances fails because Plaintiff filed dozens of

10  grievances regarding other issues in the months following the incident at issue in this case

11  (id. ast 3). Defendant also notes that Plaintiff filed grievances regarding his failure-to-protect

12  claim and his pain-medication claim, he just simply failed to properly appeal them even

13  though he properly exhausted his mental health care claim (id.). Defendant therefore

14  contends that Plaintiff obviously knew how to complete the grievance procedure (id.).

15  Defendant asserts that, contrary to Plaintiff's contention, Warden Clover did not

16  screen the grievance that included a complaint about him; rather, that grievance was screened

17  and returned by Terry Hoover, whose affidavit is attached to the reply (id. at 3 and n. 3, Ex.

18  3).

19  Finally, as to claims that he was told he couldn't grieve his failure-to-protect claim

20  until investigations were completed, Defendant argues that Plaintiff failed to identify who

21  made those comments and he obviously disregarded them because he filed a grievance on

22  May 6, 2009 (id. at 3 and n. 3).

---

24  [7]Plaintiff subsequently filed a Notice of Filing of Signed Affidavit of Plaintiff and
25  Supplement Filing in support of his opposition to Defendant's summary judgment motion;
    this supplemental filing includes additional exhibits (Doc. 183, Exs. 1-3). Defendant asks
26  the Court to strike this supplemental filing on the grounds that is untimely and that the
    Notice raises new arguments not presented in his response (Doc. 184 at 2). The Court
27  agrees that this filing is untimely and will therefore consider only Plaintiff's signed
    affidavit; the additional exhibits and any arguments raised in the Notice will not be
28  considered.

**C.    Analysis**

**1.  Counts I, III, and V-Failure to Protect**

Initially, Defendant is correct that despite the permissive language in the grievance policy, which provides that an inmate *may* proceed to the next level in the process, to comply with the PLRA, an inmate is required to complete any available administrative remedies before filing in federal court. 42 U.S.C. § 1997e(a).  Defendant must demonstrate, however, that there were remedies available to Plaintiff for his claims.  See Wyatt, 315 F.3d at 1119; see also Brown v. Valoff, 422 F.3d 926, 936-37 (9th Cir. 2005).

As to the failure-to-protect claims, Defendant does not argue the Plaintiff failed to complete the initial steps in the grievance process—attempting to resolve the issue informally and submitting a Request for Interview Form (see Doc. 179, Ex. 11, Richey Aff. ¶¶ 15, 28 (Doc. 179-2 at 21-24)).    Defendant acknowledges that Plaintiff submitted a Formal Grievance; the copy of the Prisoner Grievance form reflects that it was filled out on May 3, 2009, and received on May 6, 2009 (Doc. 179, Ex. 11, Ex. B (Doc. 179-2 at 40-44)).  In this Prisoner Grievance, Plaintiff provides extensive detail about the events related to his failure-to-protect claims (id., Ex. B (Doc. 179-2 at 40-44)).  As mentioned, this Grievance was "screened out" as devoid of merit (id., Ex. C (Doc. 179-2 at 46)).

Pursuant to the grievance policy, the next step required Plaintiff to appeal the screening determination by filing a Request for Interview Form with the Facility Standards Officer (id., Ex.11, Richey, Aff. ¶ 18 (Doc. 179-2 at 22)).  Instead, on May 15, 2009, Plaintiff filed a Request for Service Form with the Warden, who informed Plaintiff that there is an investigation currently being handled by the Eloy police department (id., Ex. D (Doc. 179-2 at 48).  Defendant is correct that failing to comply with the procedural rules set out in its grievance policy amounts to a failure to properly exhaust.  See Woodford, 548 U.S. at 90.

But Plaintiff attests that shortly after he received the May 6, 2009 Prisoner Grievance response (stating that it was devoid of merit), he was told he had to wait to file a grievance (Doc. 184, Pl. Aff. ¶ 26 (Doc. 184-1 at 8-9)).  Specifically, he states that Unit Manager Booker and Correctional Counsels Mohn and Anthony told him he had to wait until the

pending disciplinary board matters and criminal investigation were completed (id.).  In its reply, Defendant does not dispute that there were pending disciplinary matters and an ongoing criminal investigation.  In addition, because Defendant incorrectly asserts that Plaintiff failed to identify who told him that he had to wait to file a grievance, Defendant proffers no sworn statements from Booker, Mohn, or Anthony disputing that they provided this information to Plaintiff after he submitted his May 2009 Prisoner Grievance (see Doc. 184 at 3 n. 3).

Exhaustion is not required "when circumstances render administrative remedies 'effectively unavailable.'"  Sapp v. Kimbrell, 623 F.3d 813, 822 (9th Cir. 2010) (citing Nunez v. Duncan, 591 F.3d 1217, 1226 (9th Cir. 2010).  Relevant evidence that relief remains available to an inmate includes "information provided to the prisoner concerning the operation of the grievance procedure . . . ."  Brown, 422 F.3d at 937 ("information provided the prisoner is pertinent because it informs our determination of whether relief was, as a practical matter, 'available'") (quotation omitted).  The Ninth Circuit has specifically held that an inmate need not proceed in the grievance process if he has been reliably informed that no remedies are available.  Id. at 935 (holding that the prisoner-plaintiff could reasonably have understood communication to him—that his complaint was partially granted, that an investigation would be conducted, and that appropriate action would be taken if necessary—to mean that no further relief was available through the appeals process).  In Brown, the Court relied in part on the Third Circuit's holding in Brown v. Croak, which found that exhaustion was excused where prison staff erroneously informed the inmate that he must await the termination of an investigation before filing a grievance.  Id. at 938 (citing Croak, 312 F.3d 109, 111-12 (3d Cir. 2002)).

The facts in the instant case are similar.  Three officials told Plaintiff that he had to wait to file a grievance until disciplinary proceedings and a criminal investigation were completed, and it was reasonable for Plaintiff to rely on this information, whether or not it was correct.  And because Defendant does not address this issue, it is not clear when or if the disciplinary matters and criminal investigation concluded prior to Plaintiff's transfer out of

1    RRCC such that he could have proceeded to grieve his claims. The Court therefore finds that

2    Defendant has not met its burden to show that Plaintiff had an available remedy after Booker,

3    Mohn, and Anthony informed him that he had to wait to file a grievance. The request to

4    dismiss Counts I, III, and V for nonexhaustion will be denied.

5                    **2. Counts II and VII-Medical Care for Physical Injuries**

6              As stated, a medical complaint requires an inmate to attempt to informally resolve the

7    issue, submit a Request for Interview Form, submit a Formal Grievance, and then appeal any

8    screened out Formal Grievance or appeal the Formal Grievance determination to the Medical

9    Advisory Committee (Doc. 179, Ex. 11, Richey Aff. ¶¶ 15-16, 18, 20, 22 (Doc. 179-2 at 21-

10   23)). Defendant submits that there is no record that Plaintiff exhausted remedies with respect

11   to his medical care claim that he was denied adequate pain medication for his head following

12   surgery and denied treatment for an infection related to stitches on his arm (id. 26 (Doc. 179-

13   2 at 23)). Defendant provides the copy of a April 15, 209 Prisoner Grievance Form and the

14   May 28, 2009 appeal therefrom; however, Defendant states that these documents do not

15   relate to pain medication for Plaintiff's head (id. ¶ 29, Exs. E-F (Doc. 179-2 at 25, 50-55)).

16             A review of these documents, however, shows that in his Prisoner Grievance, Plaintiff

17   complains that he is denied the medication "nerotten," which appears to be the phonetic

18   spelling for Neurontin, and he explains that this was the medication that the hospital

19   physician prescribed after his brain surgery (id., Ex. E (Doc. 279-2 at 50)). Neurontin is a

20   neuropathic pain reliever. See Snow v. McDaniel, 681 F.3d 978, 983 (9th Cir. 2012)

21   (prisoner was prescribed Neurontin, "a neuropathic pain reliever," to address hip pain and

22   degeneration). Plaintiff's grievance also includes information about his problem with

23   "nerves," and he believes that may be the reason medical will not give him the Neurontin,

24   and he adds that medication for his nerves is not working (Doc. 179, Ex. E (Doc. 279-2 at

25   50)). Although it also refers to Plaintiff's mental health, this Prisoner Grievance specifically

26   alerted officials to the nature of his medical-care complaint—that he was denied prescribed

27   pain medication for his head injury after surgery. See Sapp, 623 F.3d at 824 ("[a] grievance

28   suffices to exhaust a claim if it puts the prison on adequate notice of the problem for which

1    the prisoner seeks redress").

2    In the response to this Prisoner Grievance, Plaintiff was informed that medical staff

3    is treating him appropriately (Doc. 179, Ex. E (Doc. 179-2 at 51-52)).  Plaintiff appealed this

4    response; he complained that he is not being treated appropriately, and that "if they w[]ere

5    treating me with regard to my conditions I would have some rel[]ief but they don[']t . . . ."

6    Although the appeal proceeds to complain about Plaintiff's panic disorder, he refers to more

7    than one condition, and the response from the Medical Review Committee did not reject the

8    appeal on the ground that it raised a new or different complaint from that raised in his

9    Prisoner Grievance; rather, the response refers to both mental-health care *and* medical

10   follow-up and appropriate medication (id., Ex. F (Doc. 179-2 at 55)).  Therefore, although

11   Defendant construes this grievance and appeal as related solely to Plaintiff's mental health

12   care, the face of these documents support exhaustion of Plaintiff's claim regarding denial of

13   pain medication for his head after surgery.  Plaintiff's counsel did not make this argument

14   in the response; however, the Court will not ignore relevant documentary evidence in the

15   record for the mere expediency of disposing of a claim.  Accordingly, the request to dismiss

16   Count II for nonexhaustion will be denied.

17   As to the medical-care claim in Count VII, Defendant asserts that Plaintiff did not file

18   a grievance related to his claim that he was denied medical treatment for an infection on his

19   arm, and none of submitted grievance documents pertain to such a claim (Doc. 179, Ex. 11,

20   Richey Aff. ¶ 27).  The Court notes that, according to the record, Plaintiff's injury occurred

21   in late October/early November 2009, and Plaintiff did not transfer out of RRCC until

22   December 19, 2009; thus, he remained housed at the facility during the 30 days in which he

23   was required to file a Formal Grievance (see Doc. 179, Ex. 4; Ex. 11, Richey Aff. ¶ 16 (Doc.

24   179-1 at 21, 51).  Plaintiff does not dispute that he did not file any grievance regarding this

25   claim; instead, he attests that after suffering traumatic brain injury, he had difficulty reading

26   and writing and he suffered paranoia (Doc. 183, Pl. Aff. ¶ 27).  But, as set forth above,

27   despite difficulties Plaintiff may have had following his surgery, he was able to navigate the

28   grievance procedure sufficiently to exhaust available remedies for his failure-to-protect

claims and his other medical-care claim, and it is not disputed that he properly exhausted his claim concerning mental-health care.  Consequently, Plaintiff's general assertion that he was unable to exhaust due his condition, absent any specific allegations regarding this particular claim, is insufficient to overcome evidence that he was familiar with the grievance procedure but failed to exhaust remedies for the claim in Count VII.  The medical-care claim within Count VII will be dismissed for nonexhaustion.

### 3.  Count VII-Sanitation

Defendant submits that there is no record that Plaintiff filed any grievances pertaining to claims that he was denied adequate sanitation or adequate restroom facilities while housed in a medical safe cell (Doc. 179, Ex. 11, Richey Aff. ¶ 27).  Again, Plaintiff does not dispute that he filed no grievances for these claims; he relies on the same general assertions that after surgery he had difficulties reading and writing and he suffered paranoia.  For the reason set forth above, this is insufficient to excuse exhaustion for these claims.  Defendant's Motion to Dismiss for failure to exhaust will therefore be granted as to all claims within Count VII, and that Count will be dismissed.

Accordingly, the remaining claims subject to the Motion for Summary Judgment are Counts I, III, and V, alleging failure to protect; Count II, alleging denial of prescribed pain medication following surgery; and Count IV, alleging denial of adequate mental-health care.

## V.   Summary Judgment Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.

If the movant fails to produce evidence that negates an essential element of the nonmovant's claim or defense or shows that the nonmovant does not have enough evidence

1   of an essential element to carry its ultimate burden at trial, the nonmovant need not produce

2   anything. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc., 210 F.3d 1099, 1102-03 (9th

3   Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the

4   nonmovant to demonstrate the existence of a factual dispute and that the fact in contention

5   is material, i.e., a fact that might affect the outcome of the suit under the governing law, and

6   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a

7   verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986);

8   see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The

9   nonmovant need not establish a material issue of fact conclusively in its favor, First Nat'l

10  Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); however, it must "come

11  forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec.

12  Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted);

13  see Fed. R. Civ. P. 56(c)(1).

14      At summary judgment, the judge's function is not to weigh the evidence and

15  determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477

16  U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences

17  are to be drawn in his favor." Id. at 255.

## VI.   Counts I, III, and V-Failure to Protect

### A.   Legal Standard

20      The Eighth Amendment requires prison officials to provide humane conditions of

21  confinement and to protect prisoners from violence at the hands of other prisoners. Farmer

22  v. Brennan, 511 U.S. 825, 833 (1994). Failure to protect a prisoner from attacks by other

23  inmates or from dangerous conditions at the prison violates the Eighth Amendment only if

24  two requirements are met. First, the plaintiff must show that the deprivation is objectively

25  sufficiently serious, i.e., that he faced a substantial risk of serious harm. Id. at 834. Second,

26  the plaintiff must show that the defendant acted with deliberate indifference to that risk of

27  harm. Id. at 837. To act with deliberate indifference, the official must not only have been

28  aware of facts from which the inference could be drawn that a substantial risk of serious

harm existed, but must also have drawn that inference.  Id.; Clouthier v. County of Contra Costa, 591 F.3d 1232, 1242 (9th Cir. 2010).  Nevertheless, even prison officials who know of a substantial risk to an inmate's safety "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer, 511 U.S. at 844.

With respect to Plaintiff's claim, which is brought only against CCA, a showing that he suffered a deprivation at the hands of prison employees does not, by itself, permit an inference of Defendant's culpability because there is no respondeat superior under § 1983. See Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 694 (1978).[8]  Rather, Defendant is liable only for deprivations pursuant to official custom or policy.  Id. at 690-95 (1978); see City of Canton v. Harris, 489 U.S. 378, 385 (1989) (an entity "can be found liable under 1983 only where the [entity] itself causes the constitutional violation at issue").  The requisite elements of a § 1983 policy-based claim against an entity are: (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy; (3) the policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation.  Mabe v. San Bernardino County, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (citation omitted).  An official policy may include decisions by the director, acts of the policy-making officials, or practices "so persistent and widespread as to practically have the force of law."  Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).

An entity may also be liable if its failure to train employees amounts to deliberate indifference.  Clouthier, 591 F.3d at 1249-50.  If "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,"

---

[8]All circuit courts that have the addressed the issue have held that the Monell rule barring respondeat superior liability applies to defendants who are private entities performing a government function.  See Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 (10th Cir. 2003); Jackson v. Ill. Medi-Car, Inc., 300 F.3d 760, 766 n. 6 (7th Cir. 2002); Burke v. N.D. Dep't of Corrs. and Rehabilitation, 294 F.3d 1043, 1044 (8th Cir. 2002); Austin v. Paramount Parks, Inc., 195 F.3d 715, 727-28 (4th Cir. 1999); Harvey v. Harvey, 949 F.2d 1127, 1129-30 (11th Cir. 1992); Rojas v. Alexander's Dep't Store, 924 F.2d 406, 408-09 (2d Cir. 1990). Powell v. Shopko Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982).

then the failure to provide proper training may be said to represent the entity's policy, for which it can be held liable if it causes injury.  City of Canton, 489 U.S. at 390.

### B.   Parties' Contentions

#### 1. Defendant's Motion

Defendant argues that Plaintiff cannot show that it is liable under Monell because he has not alleged or shown that Defendant's policy or custom caused the alleged constitutional violations nor has he shown that a policy was the moving force behind any violation (Doc. 178 at 9).  Defendant maintains that all of Plaintiff's allegations are directed solely at CCA employees, which is insufficient to support Defendant's liability (id.).

Defendant proceeds to argue that Plaintiff fails to establish that there were any underlying violations, which is required for entity liability (id. at 9-10).  Defendant asserts that Plaintiff claimed no involvement in the November 28 and 30, 2008 assaults, and he refused to tell officials who was involved (id. at 10). Defendant also asserts that Plaintiff concealed his December 26, 2008 assault—as assault that Plaintiff himself did not foresee and voluntarily walked into (id.).  According to Defendant, Plaintiff refused to tell staff what had happened and he lied to medical about the origin of his rib injury (id.).  As to the January 8, 2009 placement, Defendant contends that Plaintiff indicated only he did not want to be assigned to a cell in Echo or Delta Pods, and that he agreed to placement in Bravo Pod (id. at 10-11).  Defendant notes that Plaintiff refused to explain what kind of "trouble" he could be in, and he would not mention any specific inmates he did not want to be housed with (id. T 11).  For these reasons, Defendant argues that staff was not aware of a risk of harm, and they nonetheless responded reasonably by offering him protective custody, which he denied (id.).

Lastly, Defendant states that Plaintiff initiated the assault on January 8, 2009, when he stabbed Mikell, and another inmate's actions were simply in response to Plaintiff's assault on Mikell (id.).  Defendant contends that, as a result, Plaintiff's failure to protect claim fails as a matter of law (id.).

#### 2. Plaintiff's Response

1   Plaintiff asserts that Defendant is liable under <u>Monell</u> because "[p]rison personnel
2   from CO's to the Superintendent were involved in the deliberate indifference that occurred
3   when [Plaintiff] was placed in Fox Unit, not once but twice" (Doc. 181 at 15). Plaintiff states
4   that Defendant was fully aware of the threats between the Low Lifes and a rival gang as
5   evidenced by steps taken to separate them (<u>id.</u>). Plaintiff alleges that despite this knowledge,
6   they punished Plaintiff for not naming names and placed him back in a unit and pod among
7   rival gang members who had already executed three attacks on the Low Lifes (<u>id.</u>). Plaintiff
8   further asserts that Defendant also enhanced the likelihood of an assault by allowing
9   additional rival gang members who did not reside in the pod to enter with weapons, and then
10  failed to respond to the resulting assault for over ten minutes (<u>id.</u> at 13, 15). Plaintiff
11  maintains that these actions display deliberate indifference by Defendant to a substantial risk
12  of harm to Plaintiff (<u>id.</u> at 15).

13  **3. Defendant's Reply**

14  In reply, Defendant argues that Plaintiff still fails to submit any evidence that a policy
15  or custom was the moving force behind the alleged constitutional violations (Doc. 184 at 4).
16  Defendant states that Plaintiff merely relies on alleged actions by individual employees,
17  which cannot support liability as to Defendant (<u>id.</u>).

18  Defendant points to those portions of Plaintiff's response that Defendant contends
19  support that there was no underlying violation of the Eighth Amendment, including
20  Plaintiff's admissions that he did not tell staff who was involved in the November 28, 2008
21  assault, he did not tell staff who assaulted him on December 26, 2008, he lied about his
22  injuries incurred on December 26, 2008, he refused to tell staff what he meant by "trouble,"
23  he refused protective custody, and he was the first aggressor on January 8, 2009 (<u>id.</u> at 4-5).
24  Defendant argues that with these admissions, it is hard to imagine how Defendant could have
25  had actual knowledge that Plaintiff would be assaulted if placed in Fox Unit on January 8,
26  2009 (<u>id.</u> at 5).

27  Defendant asserts that there is no evidence to support Plaintiff's claims that Defendant
28  was aware of the rift between the Low Lifes and a rival gang and that his affidavit statement

provides no factual foundation to support these claims (id. at 5-6).  Defendant maintains that Plaintiff cannot raise new alternative theories of liability at summary judgment; therefore, the Court should not consider his new claims that Defendant violated his rights by allowing rival gang members into the pod or that Defendant intentionally failed to stop the assault once it began (id. at 6).  According to Defendant, Plaintiff's claim is limited to the allegation that Defendant is liable for placing him in Fox Unit on January 8, 2009 (id.).

## C.    Analysis

As stated, to support his claim against Defendant as an entity, Plaintiff must first show that he was deprived of a constitutional right.  Mabe, 237 F.3d at 1110-11.  This requires the Court to address the objective and subjective components of the Eighth Amendment inquiry.  However, because the Court finds that Plaintiff does not meet the other three elements necessary to support his policy claim against Defendant, for the purposes of this analysis, it will assume that there exists a genuine issue of material fact whether Plaintiff's placement in Fox Unit posed a substantial risk of serious harm to Plaintiff's safety.

Plaintiff is therefore required to show that Defendant had a policy and that action pursuant to this policy caused his injury.  Monell, 436 U.S. at 691; Mabe, 237 F.3d 1110-11.  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996). An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" policy.  Monell, 436 U.S. at 691.

In Count V of his Complaint, which the Court construes as the Count alleging liability against Defendant, Plaintiff alleges that despite his efforts, "CCA" put him in harm's way not once, but twice, and CCA "[k]new what would happen if they put me back in Fox unit, and that my life would be in danger" (Doc. 73-3 at 16).  In his summary-judgment response, Plaintiff argues that he has made the requisite showing under Monell because "prison personnel from CO's to the Superintendent were involved" and because Defendant was

"fully aware" of the rift between the Low Lifes and a rival gang and took reasonable steps to separate them, yet Defendant placed Plaintiff in a pod among rival gang members that had previously attacked him (Doc. 181 at 15).  Plaintiff further argues that Defendant not only placed him in harm's way, but also allowed rival gang member to enter the pod thereby enhancing the prospects of a assault (id.).

The Court finds that Plaintiff fails to allege, much less submit evidence to show, that his placement in Fox Unit was pursuant to an official policy established by Defendant.  Nor does he allege that Defendant has placed other inmates in similar conditions that pose a risk of harm, thereby suggesting that Plaintiff's experience was part of a practice or unofficial custom at RRCC.  In addition, there are no allegations that Defendant's failure to properly train employees reflected deliberate indifference or caused Plaintiff's injury.  See AE ex rel. Hernandez v. County of Tulare, 666 F.3d 631, 637 (9th Cir. 2012) (noting that previously, to support a Monell claim, a plaintiff needed only a bare allegation that allegedly unlawful conduct conformed to an unidentified policy or custom; however, it is now clear that allegations may not simply recite elements of a cause of action but must include sufficient allegations of underlying facts supporting the claim) (citing cases).

In Count I of the Complaint, which sets forth most of the specific facts supporting Plaintiff's failure-to-protect claims, Plaintiff did not mention CCA or a policy or practice; he alleges only specific acts and statements by individual employees (Doc. 73-3 at 8-12).  Unconstitutional discretionary actions of an employee, however, do not impose liability on the entity under § 1983.  See Gillette v. Delmore, 979 F.2d 1342, 1347 (9th Cir. 1992) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988) ("[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability")).  And nothing in the record, such as affidavit testimony from Unit Manager Booker or Chief of Unit Management Gina Sween, indicates that CCA employees were acting pursuant to a policy when they placed Plaintiff in Fox Unit (see Doc. 179, Exs. 1, 3 (Doc. 179-1 at 3-5, 41-42)).  Also, while entity liability may exist where an injury is caused or ratified by an individual with "final policy-making

1   authority," Plaintiff makes no claim, and the record does not support, that any of the
2   employees identified by Plaintiff exercised final policy-making authority for Defendant. See
3   Chudacoff v. Univ. Med. Center, 649 F.3d 1143, 1151 (9th Cir. 2011).

4          Finally, Plaintiff specifically alleged that after he was assaulted on December 26,
5   2008, staff did not follow standard operating procedure, which required officers to check
6   hands or marks on inmates in the pod to determine who may have been involved in the
7   incident (id. at 9).  Plaintiff also asserts that after the December 26 incident, Unit Manager
8   Booker was required to place Plaintiff in involuntary protective custody but failed to do so
9   (Doc. 183, Pl. Aff. ¶ 19).  Thus, Plaintiff's claim rests in part on employees' noncompliance
10  with Defendant's policies and practices.

11         In short, Plaintiff presents no allegations or evidence identifying a policy or custom
12  that caused a constitutional violation, much less that a policy established by Defendant
13  amounted to deliberate indifference and was the moving force behind the violation.
14  Accordingly, summary judgment will be granted on Plaintiff's policy claim against
15  Defendant for alleged failure to protect, and Counts I, III, and V will be dismissed.

16  **VII.    Motion for Leave to File Non-Electronic Document**

17         Plaintiff seeks leave to file a video CD of the January 8, 2009 altercation (Doc. 188).
18  See LRCiv 5.5(c) (requiring all documents to be electronically filed unless otherwise ordered
19  by the Court).  The Court has reviewed the video and finds that it has no bearing on whether
20  a policy existed or whether that policy was deliberately indifferent to a risk of harm.  Thus,
21  in light of its finding that Plaintiff cannot make the requisite showing under Monell to
22  support his policy claim against Defendant, the video need not be considered, and the Motion
23  for Leave to File Non-Electronic Document will be denied as moot.

24  **VIII.  Counts II and IV-Medical Care and Mental Health Care**

25         **A.    Legal Standard**

26         Under the Eighth Amendment standard, a prisoner must demonstrate "deliberate
27  indifference to serious medical needs."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)
28  (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  First, a  prisoner must show a "serious

medical need." <u>Jett</u>, 439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1992), <u>overruled on other grounds</u>, <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.  <u>Jett</u>, 439 F.3d at 1096.  The state of mind required for deliberate indifference is subjective recklessness; however, "the standard is 'less stringent in cases involving a prisoner's medical needs . . . because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" <u>Snow</u>, 681 F.3d at 985 (quoting <u>McGuckin</u>, 974 F.2d at 1060).   To show deliberate indifference, the prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the defendant "chose this course in conscious disregard of an excessive risk to plaintiff's health." <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted).  This second prong is met if the prisoner demonstrates (1) a purposeful act or failure to respond to a prisoner's medical need and (2) harm caused by the indifference.  <u>Id.</u>

Prison officials are deliberately indifferent to a prisoner's serious medical needs if they deny, delay, or intentionally interfere with medical treatment.  <u>Wood v. Housewright</u>, 900 F.2d 1332, 1334 (9th Cir. 1990).  But a delay in providing medical treatment does not constitute an Eighth Amendment violation unless the delay was harmful.  <u>Hunt v. Dental Dep't</u>, 865 F.2d 198, 200 (9th Cir. 1989) (citing <u>Shapley v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)).  And a difference of opinion as to which medically acceptable course of treatment should be followed does not amount to deliberate indifference.  <u>See</u> <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989).

Like his failure-to-protect claims discussed above, Plaintiff's medical-care and mental-health care claims are brought only against Defendant as an entity.  Therefore, Plaintiff must show that he was deprived of a constitutional right and that Defendant had a

policy that amounted to deliberate indifference and was the moving force behind the violation.  Mabe, 237 F.3d at 1110-11**.**

###### B.    Parties' Contentions

###### 1. Defendant's Motion

Defendant argues that, like his failure-to-protect claims, Plaintiff's medical claims fail because he cannot make the requisite showing under Monell (Doc. 178 at 9)**.**

Defendant next argues that Plaintiff was provided adequate and timely medical care for his injuries (id. at 12-13).  Defendant supports his motion with the affidavit of Dr. Keith Ivens, a medical expert for Defendant (Doc. 179, Ex. 8, Ivens Aff. ¶ 3 (Doc. 179-1 at 63)).  With respect to the treatment for his head injury following surgery, Defendant submits that Plaintiff claims only that he was given the wrong type or amount of medication and that this amounts to a difference in medical opinion, which is insufficient to support his claim (Doc. 178 at 13).  Defendant also notes that Plaintiff provides no expert medical testimony or medical evidence (id.).

To support summary judgment on Plaintiff's mental-health care claim, Defendant proffers the affidavit of Dr. Ahktar Hamidi, another medical expert for Defendant (Doc. 179, Ex. 11, Hamidi Aff. ¶ 3 (Doc. 179-2 at 57)).  Defendant contends that Plaintiff was treated for his anxiety and panic attacks, including treatment with various medications and monthly monitoring by mental health personnel (Doc. 178 at 14).  Defendant concludes that to the extent Plaintiff claims he should have received other medication, it again represents merely a difference of opinion and cannot support his claim (id.).

###### 2. Plaintiff's Response

In response, Plaintiff disputes Dr. Ivens' conclusion that the care he received was adequate and met the standard of care (Doc. 181 at 10).  Plaintiff avers that upon his release from the hospital, Oxycodone was ordered for pain; however, Defendant did not provide him the prescribed medication (Doc. 183, Pl. Aff. ¶ 23 (Doc. 183-1 at 8)).  Plaintiff states that, as a result, he suffered pain in his head and could not sleep (id. ¶¶ 31-32 (Doc. 183-1 at 10); Doc. 181 at 7).

1    As to his mental health treatment, although Plaintiff acknowledges that he received

2  some medication, he argues that some of the medications provided to him were inappropriate

3  for someone—like him—who had suffered a traumatic brain injury (id. at 10).[9]  Plaintiff

4  asserts that the failure to treat his mental health condition resulted in him cutting himself and

5  pulling out his own toe nails (id. at 16).  According to Plaintiff, had he received the proper

6  amount of correct medication, the pain in his head and resulting trauma could have been

7  avoided (id.).

8                     **3.  Defendant's Reply**

9    Defendant maintains that Plaintiff's conclusory assertions that he was denied proper

10  medications and adequate treatment are unsupported by any medical evidence or expert

11  testimony and, thus, cannot defeat summary judgment (Doc. 184 at 7).

12        **C.    Analysis**

13    Again, the first step in determining whether Defendant is liable as an entity for

14  constitutional violations related to medical care is examine whether was a constitutional

15  violation.  Mabe, 237 F.3d at 1110-11.  There is no argument that Plaintiff's head injury and

16  condition following surgery or his mental-health condition did not constitute serious medical

17  needs.  Whether there was a constitutional violation therefore turns on Defendant's response

18  to Plaintiff's serious medical needs.

19    The Court notes that in attempting to establish that there was no deliberate

20  indifference to either his head injury or his mental health needs, Defendant relies entirely on

21  affidavits from two expert physicians; yet, neither physician was involved in Plaintiff's

22  treatment or had any personal contact with Plaintiff (Doc. 179, Ex. 8, Ivens Aff. ¶¶ 4-5 (Doc.

23  179-1 at 63-64); Ex. 12, Hamidi Aff. ¶¶ 4-5 (Doc. 179-2 at 57-58)).  Their affidavit

24  testimony is based on a review of the pleadings; hospital records; and the medical file, mental

25

26      _____

27      [9]Plaintiff also disputes that he was seen by mental health staff every month (Doc. 181
    at 10).  But it has been deemed admitted that Plaintiff was monitored or evaluated by
28  mental health personnel on a monthly basis (Doc. 186; Doc. 185, Ex. A, Admis. No. 22
    (Doc. 185-1 at 6)).

1   health records, and medication administrative record maintained for Plaintiff by RRCC (id.,

2   Ex. 8, Ivens Aff. ¶ 4 (Doc. 179-1 at 64); Ex. 12, Hamidi Aff. ¶ 4 (Doc. 179-2 at 57)).

3   Although a few of the paragraphs within the physicians' affidavits cite to documents

4   identified by Bates numbers, none of those documents are attached to the affidavits, and there

5   are no attached medical records (see Doc. 179, Exs. 8, 12).[10] Federal Rule of Civil Procedure

6   56(c)(1)(A) requires the movant to cite the particular parts of the materials that support its

7   factual assertions.   The Advisory Committee Notes explain that under this provision,

8   "[m]aterials that are not yet in the record—*including materials referred to in an affidavit* or

9   declaration—*must be placed in the record.*" Fed. R. Civ. P. 56 advisory comm. note, 2010

10   amendments (emphasis added).  Because none of the medical records relied on by Drs. Ivens

11   and Hamidi are in the record, and because neither physician has any personal knowledge of

12   the care provided to Plaintiff, their affidavits will not be considered.  As such, Defendant

13   presents no admissible evidence to show that the treatment for Plaintiff's head injury and

14   mental health needs was not deliberately indifferent.

15       In turning to the three remaining elements necessary to support a Monell claim,

16   however, the Court finds that Plaintiff has not demonstrated that the care he received was

17   pursuant to a policy, or that a policy governing health care was deliberately indifferent to his

18   health and was the moving force behind the constitutional violation.  As with his failure-to-

19   protect claims, Plaintiff does not allege that his medical and mental health treatment was in

20   accordance with a policy established by Defendant or that Defendant failed to properly train

21   medical and mental-health care staff (see Doc. 73-3 at 13, 15).  Nor does he allege that the

22   denial of proper medication or treatment was common practice or part of pattern or custom

23   at RRCC to deny or delay care.  Plaintiff's summary judgment response also fails to set forth

24   any claim that the medical care provided to him was pursuant to policy or a result of

25   inadequate training.  Plaintiff's assertions that prescribed medication "was not provided to

26   _____

27       [10]There is one medical record, dated December 26, 2008, submitted in Exhibit 6; this
     medical record documents Plaintiff's visit to medical after he complained of rib pain (Doc.
28   179, Ex. 6 (Doc 179-1 at 55-56)).

[Plaintiff] by defendant" and that the "treatment provided to [Plaintiff] by defendant constituted deliberate indifference to his serious medical needs" are too general to support a policy-based claim under Monell (Doc. 181 at 7, 16). See 436 U.S. at 691.

For the above reasons, Defendant's Motion for Summary Judgment will be granted on Plaintiff's medical-care claim in Count II and mental-health-care claim in Count IV, and the policy-based claims against Defendant in those Counts will be dismissed.

**IT IS ORDERED:**

(1) The reference to the Magistrate is **withdrawn** as to Defendant's Motion for Summary Judgment (Doc. 178) and Plaintiff's Motion for Leave to File Non-Electronic Document (Doc. 188).

(2) Defendant's Motion for Summary Judgment (Doc. 178) is **granted** as follows:

> (a) the motion is granted as to Count VII, and this Count is dismissed without prejudice for failure to exhaust administrative remedies;

> (b) the motion is granted as to the policy-based claims in Counts I-V, and these Counts are dismissed with prejudice.

(3) Plaintiff's Motion for Leave to File Non-Electronic Document (Doc. 188) is **denied** as moot.

(4) The Clerk of Court must enter judgment accordingly and terminate the action.

DATED this 26th day of December, 2012.


_____
Robert C. Broomfield
Senior United States District Judge

- 29 -